IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| THURMON E. MOORE, II, #178615, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:16-CV-13-WHA |
| | ) | |
| CORIZON MEDICAL SERVICES, et al. | ) | |
| | ) | |
| Defendants. | ) | |

### RECOMMENDATION OF THE MAGISTRATE JUDGE

### I. INTRODUCTION

This cause of action is pending before the court on a 42 U.S.C. § 1983 complaint filed by Thurmon E. Moore, II, ("Moore"), an indigent state inmate currently incarcerated at the Staton Correctional Facility ("Staton"). In the complaint, Moore alleges that the defendants have denied him adequate medical treatment for his osteoarthritis. Moore asserts that he suffers pain in his back, hips and knees due to degenerative bone spurring with deformity/swelling to the hands, fingers and toes for which he has been denied appropriate medication to alleviate his pain. In support of these claims, Moore asserts that the attending physicians will not prescribe narcotics nor Ultram, an opioid pain reliever, and have refused to order MRI or CRT scans to aid in the assessment of his condition. Moore further complains that the medical defendants refuse to place him in chronic care for his osteoarthritis even though it is a chronic condition and also challenges the assessment of co-payments for treatment provided to him for this condition.

In the complaint, Moore seeks issuance of a preliminary injunction "ordering [the medical and correctional] defendants . . . to provide [him] with needed medical treatment— medication for pain, [special needs] profiles . . . [and] M.R.I., CRT tests. Safe environment

A.D.A. approved." Doc. 1 at 27.  On January 11, 2016, the court entered an order directing the defendants to show cause why Moore's motion for preliminary injunction should not be granted. Doc. 5.  The medical defendants filed a response to this order on March 4, 2016, supported by relevant evidentiary materials including affidavits and certified copies of Moore's medical records, in which they assert that Moore is not entitled to preliminary injunctive relief.  Doc. 29. The correctional defendants filed their response on March 8, 2016 in which they adopt the response field by the medical defendants with respect to the treatment provided Moore for his osteoarthritis. Doc. 34.  The correctional defendants maintain that Moore is provided supervision, protection and access to medical care while confined at Staton. Doc. 29-3 at 2.

Upon careful consideration of the motion for preliminary injunction and the responses thereto filed by the defendants, the court concludes that this motion is due to be denied.

## II.  STANDARD OF REVIEW

The decision to grant or deny a preliminary injunction "is within the sound discretion of the district court." *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002).  This court may grant a preliminary injunction only if Moore meets each of the following prerequisites: (1) a substantial likelihood of success on the merits; (2) a substantial threat irreparable injury will occur absent issuance of the injunction; (3) the threatened injury outweighs the potential damage the requested injunction may cause the non-moving parties; and (4) the injunction would not be adverse to the public interest. *Id.* at 1329; *Parker v. State Bd. of Pardons & Paroles*, 275 F.3d 1032, 1034-1035 (11th Cir. 2001); *Tefel v. Reno*, 180 F.3d 1286, 1295 (11th Cir. 1999); *McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1306 (11th Cir. 1998); *Cate v. Oldham*, 707 F.2d 1176 (11th Cir. 1983).  "In this Circuit, [a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion

as to the four requisites." *McDonald's*, 147 F.3d at 1306 (internal quotations omitted) (citing *All Care Nursing Serv., Inc. v. Bethesda Mem. Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989)); *Texas v. Seatrain Int'l, S.A.,* 518 F.2d 175, 179 (5th Cir. 1975) (holding that a grant of preliminary injunction "is the exception rather than the rule," and movant must clearly carry the burden of persuasion).  The moving party's failure to demonstrate a "substantial likelihood of success on the merits" may defeat the party's request for injunctive relief, regardless of the party's ability to establish any of the other requisite elements. *Church v. City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir. 1994); *see also Siegel v. Lepore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (noting that "the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper").  "The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Northeastern Fl. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fl.*, 896 F.2d 1283, 1284 (11th Cir. 1990); *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1265 (11th Cir. 2001).

### III.  DISCUSSION

In their responses to the motion for preliminary injunction, the defendants deny that they have acted with deliberate indifference to Moore's medical needs.  Specifically, the defendants maintain that medical personnel provided treatment to Moore for his osteoarthritis and resulting pain in accordance with their professional judgment, and assert that referral for an MRI or CRT is neither necessary nor warranted at this time.

In addressing Moore's claims regarding treatment provided until September of 2014, Dr. Hugh Hood, an Associate Regional Medical Director for Corizon Medical Services provides the following information:

It is my understanding from reading Mr. Moore's Complaint that he is dissatisfied with the level of care afforded him at Limestone [Correctional Facility] and Staton in regards to chronic hip pain. Based upon my review of Mr. Moore's medical records, I can state to a degree of medical certainty that Mr. Moore received a more than adequate degree of medical treatment during his incarceration at Limestone and Staton and I cannot find any reason for him to claim that the medical treatment afforded him has been anything less than complete, appropriate and acceptable in all respects.

Mr. Moore arrived at Limestone Correctional Facility in June of 2010. (COR016). After his arrival at Limestone, Mr. Moore underwent x-rays of his hips and knees in October of 2010, which indicated "modest degenerative spurring" at the junction of the femor and pelvis, i.e. the hip joint. (COR037). Bone spurring, as initially identified through these x-rays, [is] indicative of some degree of osteoarthritis. The standard of care for osteoarthritis and its common symptoms (including this form of spurring) include pain management through primarily non-steroidal anti-inflammatory medications. It is somewhat uncommon to refer patients of this nature for surgical treatment because any surgical procedure can leave patients with momentary relief followed by a dramatic decline of their condition resulting in increased [bone] spurring. As early as December 18, 2010, Mr. Moore began voicing complaints regarding the ineffectiveness of the pain medications prescribed for his on-going hip discomfort. (COR016). Thereafter, the medical staff monitored his condition on a routine basis, which included the prescription of certain pain medication including Lortab, and eventually, Mr. Moore received a referral for evaluation by an off-site rheumatologist. (COR017).

Mr. Moore saw a rheumatologist at Rheumatology Associates of North Alabama, P.C. in February of 2011. (COR038). The rheumatologist found no evidence of inflammatory synovitis (also known as "a connective tissue disease") but only underlying osteoarthritis and recommended an alteration of [Moore's] medications. (COR038-44). Following this diagnosis, Mr. Moore engaged in extended discussions with the medical staff through sick call and routine follow-up appointments in which he requested and received narcotic pain medication. (COR003-4, 045, 056-58, 060). Mr. Moore continued to receive narcotic medications at his request through April of 2012. (COR060). He also received certain "profiles" or medical authorizations allowing him to deviate from some standard prison protocols, including a profile limiting the amount of time spent standing (COR046, 048-49).

Moore submitted a sick call request related to his pain medications on May 17, 2012, and received an evaluation during sick call the next day. (COR065). In fact, the site physician saw Mr. Moore during the course of sick call to discuss his current medications. (COR065). After submitting another sick call request form and submitting to evaluation during sick call (COR066), Mr. Moore attended an appointment with the clinician at Limestone during which he complained about the recent alteration of his pain medications. (COR024). As indicated in these notations, Mr. Moore did show some signs of medication

4

dependence with generalized complaints of discomfort. (COR024). Overall, his physical examination at the time was normal. (COR024). Mr. Moore next saw the site physician at Limestone on May 30, 2012, at which time he was informed that the medication change enacted earlier in May would remain effective given his recent diagnosis of osteoarthritis. (COR025). Specifically, Mr. Moore was informed that the x-rays of his hips did not reveal any defect or deformity of any kind requiring any further evaluation or treatment and that his symptoms were primarily the result of his arthritic condition. (COR025).

Following this appointment and after consultation with the site medical staff and the regional medical staff, the decision was made to discontinue Mr. Moore's Lortab prescription, and prescribe the non-narcotic pain medical Norco as an alternative pain treatment. (COR008). On May 30, 2012, Mr. Moore was instructed to attend a follow-up appointment with the medical staff in approximately 90 days. (COR009).

Mr. Moore did not voice any complaints or submit any sick call request forms related to his medications between May 24, 2012, and August 14, 2012. (COR067). Mr. Moore received and attended a follow appointment with the site physician at Limestone on August 14, 2012, at which time they continued to discuss the treatment plan for Mr. Moore's osteoarthritis and the site physician confirmed the absence of any significant changes in Mr. Moore's overall condition before renewing his prescription for Norco. (COR009).

In response to a sick call request form submitted on August 20, 2012, the medical staff summoned Mr. Moore to the health care unit at Limestone for sick call on August 21, 2012 (COR071-73), and a subsequent appointment with the clinician on August 23, 2012. During the appointment, Mr. Moore remained "upset" because of the medical decision to discontinue his narcotic pain regimen in favor of a non-steroidal anti-inflammatory medication. (COR018). As indicated in the medical records, Mr. Moore reported to the medical staff that he had received narcotic pain medications for more than two and a half years and that he wished to meet with the site physician. (COR018-19). During the course of this appointment, Mr. Moore received another explanation as to the rationale behind the alteration of his medications. (COR018-19). Following this appointment, Mr. Moore received orders to undergo x-rays of his knees and hips dated August 23, 2012. (COR009).

Mr. Moore underwent the ordered x-rays on August 27, 2012. (COR074-76). The x-ray results did not reveal any significant differences from the prior x-rays taken in October of 2010. Mr. Moore next attended another follow-up appointment with the site physician at Limestone on August 28, 2012, at which time the physician examined Mr. Moore and again confirmed the on-going degenerative effects of the osteoarthritis upon Mr. Moore's left hip joint. (COR027). During the course of this exam, the site physician noted some potential "spurring" at the femoral head and neck and discussed with Mr. Moore the possibility of utilizing an MRI to further evaluate this potential development. (COR027). Following this appointment, the site medical director requested that we consider whether an MRI of Mr. Moore's left hip would be advisable, which

5

led to a series of discussions related to his condition. (COR009, 077). At that time, I requested and received the relevant documents from Mr. Moore's file, including his prior x-ray results, which confirmed to me that there was no need for an MRI and that no additional information could be obtained through the use of an MRI that had not been previously confirmed through the x-rays taken as of that point in time. (COR077).

The site physician at Limestone continued to monitor Mr. Moore's condition during a September 7, 2012, appointment in response to Mr. Moore's requests. (COR028, 079). Mr. Moore received orders following this appointment, directing him to return for a follow-up appointment in 30 days. (COR010). The medical staff became so concerned regarding Mr. Moore's insistence and apparent dependence upon pain medication that they referred Mr. Moore for mental health evaluation on October 4, 2012. (COR010). Mr. Moore initially refused to be seen, but was eventually evaluated in late October of 2012. (COR083).

In orders dated October 17, 2012, and November 26, 2012, Mr. Moore received orders for continuing anti-inflammatory medications including Naproxen and Tylenol. (COR010). The site physician at Limestone met with Mr. Moore, ADOC personnel and the attending registered nurse on duty on October 3, 2012, to discuss the decision not to proceed with an MRI at that time. As the site physician explained to Mr. Moore and documented in his notes from this occasion, an MRI for arthritis was not indicated and, in fact, Mr. Moore had initially refused an MRI. As also indicated, the site physician assured Mr. Moore that he would consult with me, review the x-rays already taken and consider any available options for the treatment of his condition which would effectively decrease any discomfort. (COR029). The site physician continued to monitor Mr. Moore's condition through appointments on November 26, 2012, January 3, 2013 and May 16, 2013. (COR032-33). During the May 16, 2013, appointment, the site physician again discussed with Mr. Moore the absence of any justification for continuing his narcotic pain medication. (COR033).

In orders dated May 16, 2013, the medical staff notified Mr. Moore that he would not receive any refills for any prescriptions without an appointment with the clinician. (COR011).

Mr. Moore received a renewal of his Naproxen prescription on June 3, 2013. (COR011). In orders dated June 3, 2013, the medical staff notified Mr. Moore that he would not receive any refills for any prescriptions without an appointment with the clinician. (COR011). Mr. Moore did not submit any sick call requests during the period of time between October of 2012 and November of 2013. He submitted his next sick call request form in December of 2013, complaining of pain in his hips for which he was evaluated during the course of sick call. (COR086-88). Mr. Moore received analgesic balm per orders entered following sick call dated December 4, 2013. (COR011).

Mr. Moore transferred from Limestone to Staton Correctional Facility on December 9, 2013. (COR089). Five days after arriving at Staton, Mr. Moore began submitting multiple sick call request forms [seeking] a bottom bunk profile

and additional pain medication. (COR093-98). In response to these initial sick call request forms, the Staton medical staff evaluated Mr. Moore and this examination did not reveal any alteration of his condition or any justification to alter his medication regimen at that time.

On January 16, 2014, Mr. Moore underwent an exhaustive examination by one of the site clinicians at Staton with respect to his complaints of continuing bilateral hip pain. (COR013). During this appointment, Mr. Moore specifically reported that a prior examination by a rheumatologist had not resulted in any "significant findings" which occurred "years ago." (COR013). The physical examination did not reveal any muscular weakness or atrophy and he appeared to be able to walk without any noticeable discomfort of any kind. Mr. Moore only reported pain during range of motion testing when he rotated his legs outward. At the conclusion of this appointment, the clinician specifically directed Mr. Moore to engage in daily weight bearing exercise to continue to maintain his hip and [leg] strength and provided him with an ice pack to the extent that he experienced any soreness. The clinician also instructed Mr. Moore exactly how he should modify the process for accessing his top bunk and to report any problems that he might encounter in the future. (COR013). After this examination, Mr. Moore did not submit another sick call request form for over five (5) months. (COR102).

On May 26, 2014, Mr. Moore refused all further medical treatment, including a physical examination. (COR101). Almost one month later, Mr. Moore submitted a sick call request form related to hip pain and difficulty accessing his top bunk. (COR102). He received an evaluation during sick call on June 26, 2014, which again revealed the same symptoms previously reported without any worsening of his condition. (COR102-104).

Orders dated July 16, 2014, reflect the continuation of Mr. Moore's prescription of Mobic. (COR012). On that same day, Mr. Moore also received orders to undergo certain lab work. (COR012).

Mr. Moore saw the Staton clinician again on July 30, 2014, at which time he reported complaints of "hip problems for years" and "bone spurs." (COR014). The only change noted during the physical examination from the prior examination in January of 2014, entailed Mr. Moore's reports of discomfort upon hip flexion or rotation, but there were no objective signs or symptoms which would otherwise indicate any alteration of his condition. As indicated in the notes from the clinician, the clinician did discuss the possibility of an MRI with Mr. Moore; however, his notes clearly indicate an intention to proceed with an MRI, only if it would provide useful information not otherwise discernible from the x-rays. (COR014). Following this appointment, Mr. Moore received orders to undergo another battery of x-rays related to his hips. (COR012). He also received a renewal of his current medications, orders to undergo additional lab testing and an order directing him to follow-up with the Staton clinician in two to three weeks. (COR012). In order to attempt to assuage Mr. Moore's concerns, the clinician also provided him with a bottom bunk profile for a period of 90 days, which remains in effect as of today. (COR105).

>Mr. Moore underwent another set of x-rays on August 8, 2014, which revealed only "mild osteoarthritis" in both hips. (COR107). As with the prior x-rays, this most recent set of x-rays merely confirmed the absence of any significant changes in his medical condition since October of 2010. When the medical staff next evaluated Mr. Moore on August 18, 2014, he did not voice any complaints related to hip pain. (COR015).
>
>Mr. Moore is currently scheduled for another appointment with the medical staff on October 14, 2014. (COR012). Given the extent of care provided to Mr. Moore at Limestone and Staton, I do not believe that the course of treatment Mr. Moore received was inappropriate in any way or that the conduct of the Limestone and Staton medical staff fell below the standard of care of that provided by other similarly situated medical professionals. Given this course of treatment, in my professional medical opinion, the Limestone and Staton medical staff acted appropriately in all respects. Again, based upon my review of Mr. Moore's medical records, I can state to a degree of medical certainty that the members of the medical staff at Limestone and Staton fully satisfied the standard of care owed by them within the State of Alabama.
>
>With respect to Mr. Moore's request that the Court intervene in some manner related to his medical care, Mr. Moore is currently receiving excellent medical care. There is no evidence or objective data of any kind suggesting that Mr. Moore's condition changed, worsened or declined in any way as a result of the care he has received during his incarceration. I cannot identify any meaningful diagnostic benefit of an MRI at this point. Moreover, the x-ray results obtained have clearly identified the cause of Mr. Moore's current discomfort which is mild osteoarthritis, for which he is currently receiving treatment consistent with the standard of care, i.e. a regimen of non steroidal anti-inflammatory medications. Any allegation by Mr. Moore that he currently does not have access to the medical services available to him at Staton is simply untrue.

Doc. No. 29-1 at 6-14 (paragraph numbering omitted) (affidavit initially filed in *Moore v. Corizon Medical Services, et al.*, Case No. 2:14-CV-MHT-GMB (M.D. Ala.)).

With respect to the treatment provided to Moore since September of 2014, Dr. Ronnie Herring, the Medical Director at Staton, states as follows:

>I have reviewed the records pertaining to Mr. Moore's medical treatment at Staton. Furthermore, I understand Mr. Moore's complaints that, in regard to his osteoarthritis condition, he believes the Staton medical staff should enroll him in the chronic care clinic process. I also understand Mr. Moore asserts complaints related to his bedding assignment (i.e. a top or bottom bunk), the medications prescribed for him and the co-payment fees charged during his incarceration.

8

First, as to his allegation regarding chronic care, the medical staff at Staton hold regular chronic care clinics for certain chronic conditions that require routine monitoring and most of the conditions which qualify for this chronic care process involve some level of routine lab work, such as diabetes, HIV, anticoagulation therapy and hepatitis C. The chronic care process is limited to this fairly narrow group of conditions. Arthritis and other musculoskeletal conditions are not in the category of chronic conditions that mandate or require the level of monitoring required through the chronic care clinic process and, therefore, we do not enroll patients with these forms of musculoskeletal conditions in the chronic care process because it is evident that these conditions can be managed on an as-needed basis through our sick call process. Moreover, it is clear that Mr. Moore simply wishes for us to create a chronic care clinic for his condition in order to avoid any co-payment fee, which again is unnecessary and inappropriate.

While I am not directly involved in accounting of co-payment fees, the policy related to co-payment fees at Staton has remained constant throughout my tenure at Staton. Inmates at Staton are charged a nominal fee of $4.00 on each occasion when they submit a sick call request form. These fees are charged to each individual's personal account with the Alabama Department of Corrections; however, such charges are assessed only if the individual has an account balance. Individuals who do not possess any money in their personal accounts are not charged for the co-payment fee. Moreover, the members of the medical staff at Staton do not require any patient to make the co-payment before any appointment. I am not aware of any instance when any inmate at Staton was not seen by the medical staff during the sick call process due to his inability to satisfy the co-payment fee.

Contrary to Mr. Moore's allegation, Dr. Hood is not the individual responsible for the provision of medical services at Staton and, during my tenure at Staton, Dr. Hood has not offered any medical services directly to any patients or inmates at Staton. As of the date of this affidavit, I along with the other clinicians at Staton, are responsible for the direct provision of care to Mr. Moore.

Mr. Moore was diagnosed with osteoarthritis more than three years ago. (COR208). I concur with the standard course of treatment of osteoarthritis as outlined in the prior affidavit of Dr. Hugh Hood. Since the fall of 2014 (when Dr. Hood submitted his affidavit), the medical staff at Staton has continued to monitor and treat Mr. Moore's medical conditions.

Mr. Moore refused to undergo an evaluation by one of the nurse practitioners at Staton in October of 2014—an appointment which was referenced in Dr. Hood's prior affidavit. (COR222). Mr. Moore engaged in an altercation with another inmate on December 2, 2014, resulting in an evaluation by the medical staff of his injuries. (COR262, 269-270).

In February of 2015, Mr. Moore submitted a sick call request form requesting an evaluation for his complaints of chronic care and he was evaluated by the medical staff through sick call process and referred for further evaluation by a clinician at Staton. (COR266-268). The nurse practitioner at Staton evaluated Mr. Moore on February 13, 2015, related to his request for pain

9

medication. (COR248). As referenced in the nurse practitioner's notes from this exam, Mr. Moore mentioned his prior lawsuit to the nurse practitioner and specifically requested the pain medication Ultram. (COR248). After evaluating Mr. Moore, the nurse practitioner entered orders for him to obtain profiles for bottom bunk, front of line, and cane use, all for 180 days. (COR240). The nurse practitioner also prescribed steroids for Mr. Moore. (COR248).

Dr. Stone—the physician who provided patient care at Staton before my tenure at this facility—saw Mr. Moore on February 19, 2015, at which time Mr. Moore continued to complain of low back and bilateral hip pain. Dr. Stone ordered x-rays of his lumbar spine, and continued to try to adjust Mr. Moore's medications to address these complaints. (COR240). Dr. Stone also saw Mr. Moore on March 26, 2015 and June 2, 2015, at which time Mr. Moore continued to voice the same complaints and Dr. Stone continued to adjust his medication to attempt to minimize his complaints of discomfort. (COR249-250).

In late June of 2015, the nurse practitioner began treating Mr. Moore for a skin condition. At a follow-up appointment with Dr. Stone in mid-July 2015, this condition was identified as related to a scabies infestation. (COR251-252). Scabies is similar to the more commonly known—lice—in many respects. During the course of these evaluations, Dr. Stone discussed with Mr. Moore the need to reduce his reliance on medication and to increase his personal activity in order to attempt to reduce the development of symptoms related to his osteoarthritis. (COR251-252). The medical staff continued to monitor and treat his [skin] condition until it appeared to be resolved based upon an examination conducted on August 4, 2015. (COR252).

The Staton medical staff conducted their annual physical examination of Mr. Moore on May 13, 2015, but did not note any significant changes in his condition. (COR212). Approximately two weeks later (on May 27, 2015), Mr. Moore reported to the medical staff that he did not need to be evaluated with regard to his sick call request form because he simply wanted his medications renewed and such renewals had occurred. (COR219). In July, August and September 2015, Mr. Moore failed to report to sick call for evaluation despite submitting sick call request forms during this same timeframe. (COR216-218, 254, 259).

When Mr. Moore submitted a sick call request form on September 17, 2015 related to joint pain and a requested renewal of his medications and examination by a physician, he failed to appear for evaluation at sick call. (COR258). Though Mr. Moore submitted a sick call request form related to his complaints of joint pain and dated it September 13, 2015, the medical staff did not actually receive this form until September 21, 2015. (COR257). The Staton medical staff evaluated Mr. Moore during sick call the very next day for his complaints of joint pain at which time his medications were continued. (COR255-256).

Mr. Moore submitted another sick call request form on September 30, 2015, complaining of pain in his joints, as well as his left elbow, and requesting to see a physician. (COR254). A member of the Staton nursing staff conducted the

sick call evaluation of Mr. Moore on October 2, 2015, at which time he voiced complaints related to swelling to his left elbow which had existed for approximately two (2) weeks. (COR242-243). Mr. Moore reported to the healthcare unit on October 15, 2015, at which time he saw the physician's assistant who continued to evaluate him for complaints of pain in every single joint of his body. (COR253). During the course of the evaluation, Mr. Moore would not allow the physician's assistant to conduct any range of motion examination and the physician's assistant continued his medications and referred him to me for evaluation. (COR253). At the conclusion of this appointment, the physician's assistant at Staton entered an order for Mr. Moore to see me regarding his complaints about his pain medication regimen. (COR235).

Mr. Moore simply failed to appear for evaluation by me on October 30, 2015, at which time he was summoned to the clinic for evaluation. (COR253). I do not know why he did not appear for evaluation and I did not refuse to evaluate him on this occasion. However, the suggestion by Mr. Moore that he had not been given the opportunity to see a physician in a matter of months is simply untrue. Since October 30, 2015, I cannot locate any sick call request forms submitted by Mr. Moore requesting any treatment or evaluation of any kind.

The Staton medical staff last evaluated Mr. Moore on January 8, 2016, after he reported falling, but this examination did not reveal any specific injuries or trauma which required further treatment or any worsening of his overall condition. (COR244).

We have also monitored Mr. Moore's condition through routine imagining studies over the course of time. Mr. Moore underwent an x-ray of his hips in July of 2014. (COR241). As indicated in Dr. Hood's affidavit [set forth above], the August 8, 2014, x-rays of Mr. Moore's hips indicated only "mild" osteoarthritis. (COR283-284). The medical staff conducted x-rays of Mr. Moore in March of 2015, which did not indicate any specific abnormalities. (COR282). Mr. Moore received orders dated October 8, 2015, requiring him to report to the healthcare unit for x-rays at 7:00 a.m. on October 9, 2015. (COR214, 235). The x-rays ordered at the direction of the physician's assistant, which were conducted on October 9, 2015, did not reveal any change in Mr. Moore's condition. (COR280-281). Therefore, there is no indication of any worsening or decline in Mr. Moore's condition over the last 18 months which would necessitate any reconsideration of our medical evaluations and opinions related to his treatment. Based upon these prior studies alone and the information available to us now, I cannot identify any reason for any further imaging studies to be conducted now or in the past.

Mr. Moore's claim that he has been denied necessary medication for his medical condition is also inaccurate. Since November of 2014, the medical staff did attempt to manage Mr. Moore's complaints of pain with medication. (COR231-234). Mr. Moore's medical records show evidence of the chronology of medication prescribed for him for his conditions. For example, Mr. Moore received a 60-day prescription for the pain medication Ultram from Dr. Stone on June 2, 2015. (COR230). During that same timeframe (i.e. June 2015), Mr.

11

Moore received analgesic balm to assist and control his complaints of muscular pain. (COR229). Mr. Moore also received a prescription for the steroid Prednisone on June 30, 2015. (COR228). The Staton medical staff continued to renew all of Mr. Moore's medications on July 15, August 1 and August 8, 2015. (COR227). During the course of the process of monitoring his medications, Mr. Moore received a prescription for the pain medication Mobic on July 20, 2015. (COR226). When Mr. Moore received a renewed prescription for pain medication in August of 2015, at which time he was specifically instructed by the medical staff to begin tapering his reliance on the pain medication Tramadol, which is also known as Ultram. (COR225). It is also worth noting that Mr. Moore missed a total of 33 doses of Tramadol during the period [of time] between March 26, 2015, and May 24, 2015. Tramadol is an opioid pain medication used to treat moderate to severe pain and, unfortunately, it can be habit forming. As such, we attempt to prescribe Tramadol/Ultram in shorter durations and prefer that patients do not rely upon these types of medications over a period of years, though reliance for a period of consecutive months is generally not problematic.

In Mr. Moore's case, several things are evident from a review of his medical records. First, Mr. Moore is never satisfied with the level of pain medication prescribed for him, which does suggest some level of unnecessary dependence upon pain medication. Secondly, the most efficient manner of treating Mr. Moore for his complaints of discomfort related to his osteoarthritis is not a continual reliance upon opioid pain medication. In my opinion, some lesser form of pain medication should be more than adequate to control his complaints and Mr. Moore would likely derive a significant benefit from increasing his daily activity. It is, however, important to note that there were occasions when Mr. Moore simply failed to appear to even receive his medications. For example, during the period from November 1, 2014 through November 30, 2014, Mr. Moore never appeared on one occasion to receive his Mobic pain medication. (COR300).

There is no policy or procedure of any kind which would prevent me from providing any necessary medication to any patient within the custody of the Alabama Department of Corrections. I never informed Mr. Moore that I was prevented from prescribing him any form of medication. On the occasions that I evaluated Mr. Moore, I evaluated all of his symptoms as well as his medical history in considering the most appropriate course of treatment. Unfortunately, Mr. Moore suffers from osteoarthritis which is a degenerative condition for which there is minimal treatment. As multiple physicians have indicated to Mr. Moore, the best manner of treatment related to his condition involves increased physical activity, which will strengthen his overall musculoskeletal system and combat the degenerative effects of the osteoarthritis.

Contrary to Mr. Moore's allegations, the Staton medical staff has consistently addressed his living condition at this facility. For example, the Staton medical staff provided Mr. Moore with a cane on February 17, 2015, and he acknowledged his receipt of this cane in writing. (COR220). At this same time, Mr. Moore received a "profile" also known as a Special Needs

>Communication Form instructing the security staff to assign him to a bottom bunk and permitting him to skip any lines and proceed to the front of any lines within the facility such as the line at pill call or in the dining hall. (COR221, 240). These profiles have been in place as long as I have been the medical director at Staton and we have no intention of discontinuing these profiles at this time based upon Mr. Moore's condition. (COR215, 235)
>
>If Mr. Moore feels unsafe, such is an issue related to security, as the Staton medical staff does not make housing or security decisions. There is no indication of Mr. Moore raising such complaints or concerns with the medical staff. The medical staff is however aware of a number of evaluations of Mr. Moore after various different altercations with other inmates. (COR269-270).
>
>Based upon my review of Mr. Moore's circumstances, I am confident that he has received an appropriate level of treatment. Furthermore, I cannot see any reason to conclude that the course of treatment Mr. Moore received was inappropriate in any way or that the conduct of the our medical staff fell below the standard of care of that provided by other similarly situated medical professionals. Given this course of treatment, in my professional medical opinion, our medical staff acted appropriately in all respects. Again, based upon my review of Mr. Moore's medical records, I can state to a degree of medical certainty that the members of the medical staff at Limestone and Staton fully satisfied the standard of care owed by them within the State of Alabama.
>
>With respect to Mr. Moore's continuing complaints related to his care, Mr. Moore is currently receiving excellent medical care. There is no evidence or objective data of any kind suggesting that Mr. Moore's condition changed, worsened or declined in any way as a result of the care he has received during his incarceration. I cannot identify any meaningful diagnostic benefit of an MRI at this point. Moreover, the x-ray results obtained have clearly identified the cause of Mr. Moore's current discomfort which is mild osteoarthritis, for which he is currently receiving treatment consistent with the standard of care, i.e. a regimen of non-steroidal anti-inflammatory medications. Any allegation by Mr. Moore that he currently does not have access to the medical services available to him at Staton is simply untrue.

Doc. No. 29-2 at 2-10 (paragraph numbering omitted).

Turning to the first and second prerequisites for issuance of preliminary injunctive relief, the undersigned finds that Moore fails to demonstrate either a substantial likelihood of success on the merits of his pending claims or a substantial threat that he will suffer requisite irreparable injury absent issuance of the requested preliminary injunction. Specifically, the affidavits and evidentiary materials submitted by the defendants indicate that Moore has received necessary

and appropriate treatment for his osteoarthritis—including routine evaluations, prescription of various medications, provision of multiple x-rays and issuance of special needs profiles—such that he is not substantially likely to succeed on the merits of his claims.  Moreover, the evidence before the court indicates Moore is not now suffering or likely to suffer irreparable injury absent the injunction.

The third factor, balancing potential harm to the parties, also weighs in favor of the defendants because the requested injunction would have an unduly adverse impact on the ability of medical personnel to exercise their professional judgment in determining the manner in which to treat inmates and would allow inmates, who have no medical training or expertise, to dictate the treatment they are provided.  Finally, the public interest element of the equation is, at best, a neutral factor.

In light of the foregoing, the undersigned concludes that Moore has failed to meet his burden of demonstrating the existence of each prerequisite necessary to warrant issuance of preliminary injunctive relief.

## IV.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1. The motion for preliminary injunction filed by the plaintiff be DENIED.
2. This case be referred back to the undersigned for additional proceedings.

It is further ORDERED that on or before **March 31, 2016** the parties may file objections to the Recommendation. The plaintiff must specifically identify the factual findings and legal conclusions in the Recommendation to which the objection is made.  Frivolous, conclusive or general objections addressed to the Recommendation will not be considered.  Failure to file written objections to the Magistrate Judge's findings and recommendations in accordance with

the provisions of 28 U.S.C. § 636(b)(1) shall bar a de novo determination by the District Court of legal and factual issues covered in the Recommendation and waives the right of the plaintiff to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); 11th Cir. R. 3-1; *see Stein v. Lanning Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982); *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

DONE this 17th day of March, 2016.

/s/ Gray M. Borden
UNITED STATES MAISTRATE JUDGE