IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

THURMON E. MOORE, II, #178615,        )
                                      )
          Plaintiff,                  )
                                      )
    v.                                )     CASE NO. 2:16-CV-13-WHA
                                      )              [WO]
                                      )
CORIZON MEIDICAL SERVICES, et al.,    )
                                      )
          Defendants.                 )

## RECOMMENDATION OF THE MAGISTRATE JUDGE

## I.  INTRODUCTION

This 42 U.S.C. § 1983 action is before the court on a complaint filed by Thurmon

E. Moore, II, a state inmate, challenging conditions present during his prior term of

incarceration at the Staton Correctional Facility.   Specifically, Moore alleges that the

defendants denied him adequate medical treatment for his osteoarthritis and refused to

place him in a chronic care clinic for this condition.   He also questions the

constitutionality of co-payments assessed for certain treatment provided to him.   Finally,

Moore contends that correctional officials subjected him to unconstitutional conditions.

Moore names as defendants Corizon Medical Services, the contract medical care provider

for the state prison system;[1] Dr. Hugh Hood, the Regional Medical Director for Corizon;

Dr. Karen Stone and Dr. Ronnie Herring, physicians at Staton during the time relevant to

---

[1] Corizon Medical Services is now known as Corizon, LLC.  For purposes of this Recommendation and in
the interest of clarity, the court will simply refer to this defendant as Corizon.

the complaint; Michelle Sagers-Copeland, Nancy Long, Cebria Lee, Tammra Wood, Regina Mitchell and Tamelria Tellis, nurses at Staton; Leeposey Daniels, Leon Forniss and John Crow, wardens at Staton; and Kim T. Thomas, the former commissioner of the Alabama Department of Corrections.[2]  Moore seeks a declaratory judgment, injunctive relief and monetary damages for the alleged violations of his constitutional rights. Doc. 1 at 1–2 & 27.

The defendants filed a special report and relevant evidentiary materials in support of their report, including affidavits and certified copies of Moore's medical records, addressing the claims raised in the complaint.  In these documents, the medical and correctional defendants maintain they did not act with deliberate indifference to Moore's medical needs and the correctional defendants deny they subjected Moore to unconstitutional conditions.

After reviewing the special report filed by the defendants, the court issued an order on March 22, 2016 directing Moore to file a response to each of the arguments set forth by the defendants in their report, supported by affidavits or statements made under penalty of perjury and other evidentiary materials. Doc. 43 at 2.  The order specifically cautioned that "unless within fifteen (15) days from the date of this order a party . . .

---

[2] Moore seeks relief from the defendants in both their individual and official capacities. Doc. 1 at 1. "[W]hen [government] officials sued in [their official] capacity in federal court die or leave office, their successors automatically assume their roles in the litigation." *Hafer v. Melo*, 502 U.S. 21, 25 (1991). Thus, with respect to Moore's claims against former commissioner Kim Thomas in his official capacity, current commissioner Jefferson Dunn is the appropriate defendant.  As to the personal or individual capacity claims lodged against defendant Thomas for actions or conditions that occurred during his tenure as Commissioner, Thomas remains a proper defendant. *Walton ex rel. R.W. v. Montgomery County Bd. of Educ.*, 371 F. Supp. 2d 1318, 1320 n.1 (M.D. Ala. 2005) (finding that a new official may be substituted for official capacity claim but not for individual capacity claim).

presents sufficient legal cause why such action should not be undertaken . . . the court may at any time [after expiration of the time for the plaintiff filing a response to this order] and without further notice to the parties (1) treat the special report and any supporting evidentiary materials as a motion for summary judgment and (2) after considering any response as allowed by this order, rule on the motion for summary judgment in accordance with the law." Doc. 43 at 3.  Moore filed a sworn response to this order on April 18, 2016. Doc. 49.

Pursuant to the directives of the order entered on March 22, 2016, the court now treats the defendants' report as a motion for summary judgment and concludes that summary judgment is due to be granted in favor of the defendants.

## II.  SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law." *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (internal quotation marks omitted); Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate

3

the absence of a genuine issue [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (holding that moving party has initial burden of showing there is no genuine dispute of material fact for trial).  The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present appropriate evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322–24; *Moton v. Cowart*, 631 F.3d 1337, 1341 (11th Cir. 2011) (holding that moving party discharges his burden by showing the record lacks evidence to support the nonmoving party's case or the nonmoving party would be unable to prove his case at trial).

When the defendants meet their evidentiary burden, as they have in this case, the burden shifts to the plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(3); *Jeffery*, 64 F.3d at 593–94 (holding that, once a moving party meets its burden, "the non-moving party must then go beyond the pleadings, and by its own affidavits [or statements made under penalty of perjury], or by depositions, answers to interrogatories, and admissions on file," demonstrate that there is a genuine dispute of material fact).  In civil actions filed by inmates, federal courts "must distinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities.  Unless a prisoner can point to

sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage." *Beard v. Banks*, 548 U.S. 521, 530 (2006) (internal citation omitted).  This court will also consider "specific facts" pled in a plaintiff's sworn complaint when considering his opposition to summary judgment. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014).  A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable factfinder to return a verdict in its favor such that summary judgment is not warranted. *Greenberg*, 498 F.3d at 1263; *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1313 (11th Cir. 2007).  "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted).  "[T]here must exist a conflict in substantial evidence to pose a jury question." *Hall v. Sunjoy Indus. Group, Inc.*, 764 F. Supp. 2d 1297, 1301 (M.D. Fla. 2011) (citation omitted).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Although factual inferences must be viewed in a light most favorable to the plaintiff and *pro se* complaints are entitled to liberal interpretation, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *See Beard*, 548 U.S. at 525; *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990).

Thus, Moore's *pro se* status alone does not compel this court to disregard elementary principles of production and proof in a civil case.

The court has undertaken a thorough and exhaustive review of all the evidence contained in the record.  After this review, the court finds that Moore has failed to demonstrate a genuine dispute of material fact in order to preclude entry of summary judgment in favor of the defendants.

### III.  DISCUSSION[3]

### A.    Absolute Immunity—Correctional Defendants

To the extent Moore lodges claims against the correctional defendants in their official capacities and seeks monetary damages, these defendants are entitled to absolute immunity.  Official capacity lawsuits are "in all respects other than name . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985).  As the Eleventh Circuit has held,

> the Eleventh Amendment prohibits federal courts from entertaining suits by private parties against States and their agencies [or employees].  There are two exceptions to this prohibition: where the state has waived its immunity or where Congress has abrogated that immunity.  A State's consent to suit must be unequivocally expressed in the text of [a] relevant statute.  Waiver may not be implied.  Likewise, Congress' intent to abrogate the States' immunity from suit must be obvious from a clear legislative statement.

---

[3] The court limits its review to the allegations set forth in the complaint because "[a] plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004); *Ganstine v. Sec'y, Fla. Dept. of Corrs.*, 502 F. App'x. 905, 909–10 (11th Cir. 2012) (holding that a plaintiff may not amend complaint at the summary judgment stage by raising a new claim or presenting a new basis for a pending claim); *Chavis v. Clayton Cnty. Sch. Dist.*, 300 F.3d 1288, 1291 n. 4 (11th Cir. 2002) (holding that district court properly refused to address a new theory raised during summary judgment because the plaintiff had not properly amended the complaint).

*Selensky v. Alabama*, 619 F. App'x 846, 848–49 (11th Cir. 2015) (internal quotation marks and citations omitted).   Thus, a state official may not be sued in his official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100 (1984), or Congress has abrogated the State's immunity, *see Seminole Tribe v. Florida*, 517 U.S. 44, 59 (1996).

> Neither waiver nor abrogation applies here.   The Alabama Constitution states that "the State of Alabama shall never be made a defendant in any court of law or equity." Ala. Const. Art. I, § 14.   The Supreme Court has recognized that this prohibits Alabama from waiving its immunity from suit.

*Selensky*, 619 F. App'x at 849 (citing *Alabama v. Pugh,* 438 U.S. 781, 782 (1978)). "Alabama has not waived its Eleventh Amendment immunity in § 1983 cases, nor has Congress abated it." *Holmes v. Hale*, 701 F. App'x 751, 753 (11th Cir. 2017) (citing *Carr v. City of Florence*, Ala., 916 F.2d 1521, 1525 (11th Cir. 1990)).

In light of the foregoing, defendants Forniss, Daniels, Thomas and Crow are entitled to sovereign immunity under the Eleventh Amendment for all claims seeking monetary damages from them in their official capacities. *Selensky*, 619 F. App'x at 849; *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1277 (11th Cir. 1998) (holding that state officials sued in their official capacities are protected under the Eleventh Amendment from suit for damages); *Edwards v. Wallace Comm. College*, 49 F.3d 1517, 1524 (11th Cir. 1995) (holding that damages are unavailable from a state official sued in his official capacity).

**B.     Deliberate Indifference to Medical Needs**

The claims presently before this court address medical treatment provided to Moore from mid-September 2014 until the filing of the instant complaint in early January 2016.[4]   Specifically, Moore alleges that the medical defendants acted with deliberate indifference to his chronic pain caused by osteoarthritis. Doc 1 at 3–14.   Moore further argues that the correctional defendants, as wardens, are responsible for ensuring that he receive appropriate medical treatment. Doc. 1 at 2 & 13.   These assertions entitle Moore to no relief.

### 1.     Standard of Review

To prevail on a claim concerning an alleged denial of medical treatment, an inmate must—at a minimum—show that the defendant acted with deliberate indifference to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989).   Medical and correctional personnel may not subject an inmate to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106; *Adams v. Poag*, 61 F.3d 1537, 1546 (11th Cir. 1995) (holding, as directed by *Estelle*, that a plaintiff must establish "not merely the knowledge of a condition, but the knowledge of necessary treatment coupled with a refusal to treat or a delay in [the acknowledged necessary] treatment").

---

[4] The court addressed claims regarding medical treatment provided to Moore prior to September 11, 2014 in *Moore v. Corizon Medical Services, et al.*, Case No. 2:14-CV-865-MHT-GMB (M.D. Ala. 2017). *See* Doc. 26.

> That medical malpractice—negligence by a physician—is insufficient to form the basis of a claim for deliberate indifference is well settled. *See Estelle v. Gamble,* 429 U.S. 97, 105–07, 97 S. Ct. 285, 292, 50 L. Ed. 2d 251 (1976); *Adams v. Poag,* 61 F.3d 1537, 1543 (11th Cir. 1995). Instead, something more must be shown. Evidence must support a conclusion that a prison [medical care provider's] harmful acts were intentional or reckless. *See Farmer v. Brennan,* 511 U.S. 825, 833–38, 114 S. Ct. 1970, 1977–79, 128 L.Ed.2d 811 (1994); *Cottrell v. Caldwell,* 85 F.3d 1480, 1491 (11th Cir. 1996) (stating that deliberate indifference is equivalent of recklessly disregarding substantial risk of serious harm to inmate); *Adams,* 61 F.3d at 1543 (stating that plaintiff must show more than mere negligence to assert an Eighth Amendment violation); *Hill v. DeKalb Regional Youth Detention Ctr.,* 40 F.3d 1176, 1191 n. 28 (11th Cir. 1994) (recognizing that Supreme Court has defined "deliberate indifference" as requiring more than mere negligence and has adopted a "subjective recklessness" standard from criminal law); *Qian v. Kautz,* 168 F.3d 949, 955 (7th Cir. 1999) (stating "deliberate indifference" is synonym for intentional or reckless conduct, and that "reckless" conduct describes conduct so dangerous that deliberate nature can be inferred).

*Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999).

An Eighth Amendment violation requires proof of both objective and subjective elements. *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014). With respect to the requisite objective elements of a deliberate indifference claim, an inmate must first show "an objectively substantial risk of serious harm . . . exist[ed]. Second, once it is established that the official [was] aware of this substantial risk, the official must [have] react[ed] to this risk in an objectively unreasonable manner." *Marsh*, 268 F.3d at 1028–29. As to the subjective elements, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. . . . The Eighth Amendment does not outlaw cruel and unusual conditions; it outlaws cruel and unusual punishments. . . . [A]n

official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 837–38 (internal quotation marks omitted); *Campbell v. Sikes,* 169 F.3d 1353, 1364 (11th Cir. 1999) (citing *Farmer*, 511 U.S. at 838) ("Proof that the defendant should have perceived the risk, but did not, is insufficient."); *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (same).  The conduct at issue "must involve more than ordinary lack of due care for the prisoner's interests or safety . . . . It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, [providing security for inmates], or restoring official control over a tumultuous cellblock." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

    In order to establish "deliberate indifference to [a] serious medical need . . . , Plaintiff[] must show: (1) a serious medical need; (2) the defendant['s] deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009).  When seeking relief based on deliberate indifference, an inmate is required to establish "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need and an actual inference of required action from those facts." *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (holding that, for liability to attach, the official must know of and then disregard an excessive risk to the

prisoner).  Regarding the objective component of a deliberate indifference claim, the plaintiff must first show "an objectively serious medical need[] . . . and second, that the response made by [the defendants] to that need was poor enough to constitute an unnecessary and wanton infliction of pain, and not merely accidental inadequacy, negligen[ce] in diagnos[is] or treat[ment], or even [m]edical malpractice actionable under state law." *Taylor*, 221 F.3d at 1258 (internal quotation marks and citations omitted).  To proceed on a claim challenging the constitutionality of medical care, "[t]he facts alleged must do more than contend medical malpractice, misdiagnosis, accidents, [or] poor exercise of medical judgment." *Daniels v. Williams*, 474 U.S. 327, 330–33 (1986).

In addition, "to show the required subjective intent . . . , a plaintiff must demonstrate that the public official acted with an attitude of deliberate indifference . . . which is in turn defined as requiring two separate things[:] awareness of facts from which the inference could be drawn that a substantial risk of serious harm exists [] and . . . draw[ing] of the inference[.]" *Taylor*, 221 F.3d at 1258 (internal quotation marks and citations omitted).  Thus, deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (holding that defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference).  Furthermore, "an

official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.  When medical personnel attempt to diagnose and treat an inmate, the mere fact that the chosen "treatment was ineffectual . . . does not mean that those responsible for it were deliberately indifferent." *Massey v. Montgomery Cnty. Det. Facility*, 646 F. App'x 777, 780 (11th Cir. 2016).

> In articulating the scope of inmates' right to be free from deliberate indifference, . . . the Supreme Court has . . . emphasized that not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle,* 429 U.S. at 105, 97 S. Ct. at 291; *Mandel* [*v. Doe,* 888 F.2d 783, 787 (11th Cir. 1989)].  Medical treatment violates the eighth amendment only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Rogers*, 792 F.2d at 1058 (citation omitted).  Mere incidents of negligence or malpractice do not rise to the level of constitutional violations. *See Estelle,* 429 U.S. at 106, 97 S. Ct. at 292 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Mandel*, 888 F.2d at 787–88 (mere negligence or medical malpractice 'not sufficient' to constitute deliberate indifference); *Waldrop,* 871 F.2d at 1033 (mere medical malpractice does not constitute deliberate indifference).  Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment. *See Waldrop,* 871 F.2d at 1033 (citing *Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir. 1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991).  "[A]s *Estelle* teaches, whether government actors should have employed additional diagnostic techniques or forms of treatment is a classic example of a matter for medical judgment and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545 (internal quotation marks and citation omitted).  To show deliberate indifference,

the plaintiff must demonstrate a serious medical need and then must establish that the defendant's response to the need was more than "merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law." *Taylor*, 221 F.3d at 1258 (internal quotation marks and citation omitted); *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) (holding that "[a] difference of opinion as to how a condition should be treated does not give rise to a constitutional violation"); *Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1575 (11th Cir. 1985) (holding that the mere fact an inmate desires a different mode of medical treatment does not amount to deliberate indifference violative of the Constitution); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981) (holding that prison medical personnel do not violate the Eighth Amendment simply because their opinions concerning medical treatment conflict with that of the inmate-patient); *Amarir v. Hill*, 243 F. App'x 353, 354 (9th Cir. 2007) (holding that defendant's "denial of plaintiff's request to see an outside specialist . . . did not amount to deliberate indifference"); *Arzaga v. Lovett*, 2015 WL 4879453, at *4 (E.D. Cal. Aug. 14, 2015) (finding that plaintiff's preference for a second opinion is "not enough to establish defendant's deliberate indifference" as the allegation does "not show that defendant knowingly disregarded a serious risk of harm to plaintiff" nor that defendant "exposed plaintiff to any serious risk of harm").

### 2.   *Medical Defendants*

Moore asserts he suffers pain in his back, hips, and knees due to degenerative bone spurring with swelling to the hands, fingers and toes for which he has been denied

appropriate medication to alleviate his pain and diagnostic tests to determine the source of his pain. Doc. 1 at 4.  Moore further contends that his attending physicians did not prescribe narcotics or Ultram,[5] refused to order MRI or CRT scans to aid in the assessment of his condition, and failed to refer him to an outside bone specialist. Doc. 1 at 3–14.  Moore further complains that the medical defendants refused to place him on chronic care for his osteoarthritis even though this condition is chronic in nature. Doc. 1 at 4.  Finally, Moore maintains that medical personnel failed to provide him medical profiles for bottom bunk, cane, front of the line, and no prolonged standing. Doc. 1 at 5 & 14.

The medical defendants adamantly deny that they acted with deliberate indifference to Moore's medical needs during the time relevant to this complaint or at any other time.  Instead, they maintain that Moore had continuous access to health care personnel and received treatment from medical professionals for his chronic pain, including evaluations and examinations by the nursing staff comprised of licensed practical nurses, registered nurses, and certified registered nurse practitioners[6] (*see* Doc. 42-14 at 35–36 & 47–59); evaluations and consultations with facility physicians (*see* Doc. 42-14 at 38–46); prescriptions for various medications to alleviate his pain and discomfort such as Ultram (tramadol), Mobic (meloxicam), Prednisone, Tylenol, and an analgesic balm (*see* Doc. 42-14 at 18–32); issuance of medical profiles for a bottom

---

[5] Ultram, the brand name for Tramadol, is an opioid pain reliever designated a Schedule IV controlled substance by Congress in August of 2014.  This designation resulted in severe restrictions on its prescription by physicians.

[6] Throughout their affidavits, Dr. Hood and Dr. Herring identify the certified registered nurse practitioners ("CRNPs") as clinicians.

bunk, cane, limited standing and front of the line (*see* Doc. 42-14 at 7–8, 13–14, 16 &

18); and provision of x-rays to evaluate his conditions (*see* Docs. 42-12 at 21–22 & 42-15

at 14–18).   The medical records further demonstrate that medical personnel at Staton

evaluated Moore each time he appeared at sick call or medical appointments with

complaints related to his chronic pain, assessed his need for treatment, prescribed

medications to alleviate the pain associated with his condition when they deemed such

necessary, issued medical profiles as warranted, and provided treatment to Moore in

accordance with their professional judgment.

 The defendants submitted affidavits and relevant medical records in response to

the claims presented by Moore. The affidavits are corroborated by the objective medical

records contemporaneously compiled throughout the treatment process.   In his affidavit,

Dr. Hood provides a synopsis of the treatment provided to Moore upon his transfer

Draper.

> Mr. Moore transferred from Limestone to Staton Correctional Facility on
> December 9, 2013. (COR089).[7]   Five days after arriving at Staton, Mr.
> Moore began submitting multiple sick call request forms [requesting] a
> bottom bunk profile and additional pain medication. (COR093-98).   In
> response to these initial sick call request forms, the Staton medical staff
> evaluated Mr. Moore and this examination did not reveal any alteration of
> his condition or any justification to alter his medication regimen at that
> time.
>  On January 16, 2014, Mr. Moore underwent an exhaustive
> examination by one of the site clinicians at Staton with respect to his
> complaints of continuing bilateral hip pain. (COR013). During this
> appointment, Mr. Moore specifically reported that a prior examination by a
> rheumatologist had not resulted in any "significant findings" which

---

[7] Citations to the medical records in the defendants' affidavits reference the page numbers assigned these
documents by the medical care provider.

occurred "years ago." (COR013). The physical examination did not reveal any muscular weakness or atrophy and he appeared to be able to walk without any noticeable discomfort of any kind.  Mr. Moore only reported pain during range of motion testing when he rotated his legs outward.  At the conclusion of this appointment, the clinician specifically [prescribed Mobic,] directed Mr. Moore to engage in daily weight bearing exercise to continue to maintain his hip and [leg] strength and provided him with an ice pack to the extent that he experienced any soreness.  The clinician also instructed Mr. Moore exactly how he should modify the process for accessing his top bunk and to report any problems that he might encounter in the future. (COR013).  After this examination, Mr. Moore did not submit another sick call request form for over five (5) months. (COR102).

On May 26, 2014, Mr. Moore refused [his regular physical, "including vital signs, blood [and] sugar test[s], urinalysis, Labs, education, rectum exam, oral screening, EKG, eye exam and dentist."]. (COR101). Almost one month later [on June 23, 2014], Mr. Moore submitted a sick call request form related to hip pain and difficulty accessing his top bunk. (COR102). He received an evaluation during sick call on June 26, 2014, which again revealed the same symptoms previously reported without any worsening of his condition. (COR102-104).

Orders dated July 16, 2014, reflect the continuation of Mr. Moore's prescription of Mobic. (COR012). On that same day, Mr. Moore also received orders to undergo certain labwork. (COR012).

Mr. Moore saw the Staton clinician again on July 30, 2014, at which time he reported complaints of "hip problems for years" and "bone spurs." (COR014).  The only change noted during the physical examination from the prior examination in January of 2014, entailed Mr. Moore's reports of discomfort upon hip flexion or rotation, but there were no objective signs or symptoms which would otherwise indicate any alteration of his condition. As indicated in the notes from the clinician, the clinician did discuss the possibility of an MRI with Mr. Moore; however, his notes clearly indicate an intention to proceed with an MRI, only if it would provide useful information not otherwise discernible from the x-rays. (COR014). Following this appointment, Mr. Moore received orders to undergo another battery of x-rays related to his hips. (COR012). He also received a renewal of his current medications, orders to undergo additional lab testing and an order directing him to follow-up with the Staton clinician in two to three weeks. (COR012).  In order to attempt to assuage Mr. Moore's concerns, the clinician also provided him with a bottom bunk profile for a period of 90 days, which remains in effect as of [September 8, 2014]. (COR105).

Mr. Moore underwent another set of x-rays on August 8, 2014, which revealed only "mild osteoarthritis" in both hips. (COR107).  As with

the prior x-rays, this most recent set of x-rays merely confirmed the absence of any significant changes in his medical condition since October of 2010. When the medical staff next evaluated Mr. Moore on August 18, 2014, he did not voice any complaints related to hip pain. (COR015).

Mr. Moore is currently scheduled for another appointment with the medical staff on October 14, 2014. (COR012).  Given the extent of care provided to Mr. Moore at . . . Staton, I do not believe that the course of treatment Mr. Moore received was inappropriate in any way or that the conduct of the . . . Staton medical staff fell below the standard of care of that provided by other similarly situated medical professionals.  Given this course of treatment, in my professional medical opinion, the . . . Staton medical staff acted appropriately in all respects.  Again, based upon my review of Mr. Moore's medical records, I can state to a degree of medical certainty that the members of the medical staff at . . . Staton fully satisfied the standard of care owed by them within the State of Alabama.

Doc. 42-1 at 11–14 (paragraph numbering omitted and footnote added).

With respect to the treatment provided to Moore since September of 2014, Dr.

Ronnie Herring, the Medical Director at Staton, states as follows:

I have reviewed the records pertaining to Mr. Moore's medical treatment at Staton.  Furthermore, I understand Mr. Moore's complaints that, in regard to his osteoarthritis condition, he believes the Staton medical staff should enroll him in the chronic care clinic process.  I also understand Mr. Moore asserts complaints related to his bedding assignment (i.e. a top or bottom bunk), the medications prescribed for him and the co-payment fees charged during his incarceration.

First, as to his allegation regarding chronic care, the medical staff at Staton hold regular chronic care clinics for certain chronic conditions that require routine monitoring and most of the conditions which qualify for this chronic care process involve some level of routine lab work, such as diabetes, HIV, anticoagulation therapy and hepatitis C.  The chronic care process is limited to this fairly narrow group of conditions. Arthritis and other musculoskeletal conditions are not in the category of chronic conditions that mandate or require the level of monitoring required through the chronic care clinic process and, therefore, we do not enroll patients with these forms of musculoskeletal conditions in the chronic care process because it is evident that these conditions can be managed on an as-needed basis through our sick call process. Moreover, it is clear that Mr. Moore simply wishes for us to create a chronic care clinic for his condition in

17

order to avoid any co-payment fee, which again is unnecessary and inappropriate.

While I am not directly involved in accounting of co-payment fees, the policy related to co-payment fees at Staton has remained constant throughout my tenure at Staton. Inmates at Staton are charged a nominal fee of $4.00 on each occasion when they submit a sick call request form. These fees are charged to each individual's personal account with the Alabama Department of Corrections[.] . . . [T]he members of the medical staff at Staton do not require any patient to make the co-payment before any appointment.  I am not aware of any instance when any inmate at Staton was not seen by the medical staff during the sick call process due to his inability to satisfy the co-payment fee.

Contrary to Mr. Moore's allegation, Dr. Hood is not the individual responsible for the provision of medical services at Staton and, during my tenure at Staton, Dr. Hood has not offered any medical services directly to any patients or inmates at Staton. As of the date of this affidavit, I along with the other clinicians at Staton, are responsible for the direct provision of care to Mr. Moore.

Mr. Moore was diagnosed with osteoarthritis more than three years ago. (COR208). I concur with the standard course of treatment of osteoarthritis as outlined in the prior affidavit of Dr. Hugh Hood.  Since the fall of 2014 (when Dr. Hood submitted his affidavit), the medical staff at Staton has continued to monitor and treat Mr. Moore's medical conditions.

Mr. Moore refused to undergo an evaluation by one of the nurse practitioners at Staton in October of 2014—an appointment which was referenced in Dr. Hood's prior affidavit. (COR222).  Mr. Moore engaged in an altercation with another inmate on December 2, 2014, resulting in an evaluation by the medical staff of his injuries. (COR262, 269–270).

In February of 2015, Mr. Moore submitted a sick call request form requesting an evaluation for his complaints of chronic care and he was evaluated by the medical staff through sick call process and referred for further evaluation by a clinician at Staton. (COR266–268).  The nurse practitioner at Staton evaluated Mr. Moore on February 13, 2015, related to his request for pain medication. (COR248). As referenced in the nurse practitioner's notes from this exam, Mr. Moore mentioned his prior lawsuit to the nurse practitioner and specifically requested the pain medication Ultram. (COR248). After evaluating Mr. Moore, the nurse practitioner entered orders for him to obtain profiles for bottom bunk, front of line, and cane use, all for 180 days. (COR240). The nurse practitioner also prescribed steroids for Mr. Moore. (COR248).

Dr. Stone—the physician who provided patient care at Staton before my tenure at this facility—saw Mr. Moore on February 19, 2015, at which

time Mr. Moore continued to complain of low back and bilateral hip pain. Dr. Stone ordered x-rays of his lumbar spine, and continued to try to adjust Mr. Moore's medications to address these complaints. (COR240).  Dr. Stone also saw Mr. Moore on March 26, 2015 and June 2, 2015, at which time Mr. Moore continued to voice the same complaints and Dr. Stone continued to adjust his medication to attempt to minimize his complaints of discomfort. (COR249–250).

In late June of 2015, the nurse practitioner began treating Mr. Moore for a skin condition.   At a follow-up appointment with Dr. Stone in mid-July 2015, this condition was identified as related to a scabies infestation. (COR251–252).   Scabies is similar to the more commonly known—lice—in many respects.   During the course of these evaluations, Dr. Stone discussed with Mr. Moore the need to reduce his reliance on medication and to increase his personal activity in order to attempt to reduce the development of symptoms related to his osteoarthritis. (COR251–252). The medical staff continued to monitor and treat his [skin] condition until it appeared to be resolved based upon an examination conducted on August 4, 2015. (COR252).

The Staton medical staff conducted their annual physical examination of Mr. Moore on May 13, 2015, but did not note any significant changes in his condition. (COR212).  Approximately two weeks later (on May 27, 2015), Mr. Moore reported to the medical staff that he did not need to be evaluated with regard to his sick call request form because he simply wanted his medications renewed and such renewals had occurred. (COR219).   In July, August and September 2015, Mr. Moore failed to report to sick call for evaluation despite submitting sick call request forms during this same timeframe. (COR216–218, 254, 259).

When Mr. Moore submitted a sick call request form on September 17, 2015 related to joint pain and [] requested renewal of his medications and examination by a physician, he failed to appear for evaluation at sick call. (COR258).  Though Mr. Moore submitted a sick call request form related to his complaints of joint pain and dated it September 13, 2015, the medical staff did not actually receive this form until September 21, 2015. (COR257).  The Staton medical staff evaluated Mr. Moore during sick call the very next day for his complaints of joint pain at which time his medications were continued. (COR255–256).

Mr. Moore submitted another sick call request form on September 30, 2015, complaining of pain in his joints, as well as his left elbow, and requesting to see a physician. (COR254).  A member of the Staton nursing staff conducted the sick call evaluation of Mr. Moore on October 2, 2015, at which time he voiced complaints related to swelling to his left elbow which had existed for approximately two (2) weeks. (COR242-243).  Mr.

Moore reported to the healthcare unit on October 15, 2015, at which time he saw the physician's assistant who continued to evaluate him for complaints of pain in every single joint of his body. (COR253). During the course of the evaluation, Mr. Moore would not allow the physician's assistant to conduct any range of motion examination and the physician's assistant continued his medications and referred him to me for evaluation. (COR253). At the conclusion of this appointment, the physician's assistant at Staton entered an order for Mr. Moore to see me regarding his complaints about his pain medication regimen. (COR235).

Mr. Moore simply failed to appear for evaluation by me on October 30, 2015, at which time he was summoned to the clinic for evaluation. (COR253). I do not know why he did not appear for evaluation and I did not refuse to evaluate him on this occasion. However, the suggestion by Mr. Moore that he had not been given the opportunity to see a physician in a matter of months is simply untrue. Since October 30, 2015, I cannot locate any sick call request forms submitted by Mr. Moore requesting any treatment or evaluation of any kind.

The Staton medical staff last evaluated Mr. Moore on January 8, 2016, after he reported falling, but this examination did not reveal any specific injuries or trauma which required further treatment or any worsening of his overall condition. (COR244).

We have also monitored Mr. Moore's condition through routine imagining studies over the course of time. Mr. Moore underwent an x-ray of his hips in July of 2014. (COR241). As indicated in Dr. Hood's affidavit [set forth above], the August 8, 2014, x-rays of Mr. Moore's hips indicated only "mild" osteoarthritis. (COR283–284). The medical staff conducted x-rays of Mr. Moore in March of 2015, which did not indicate any specific abnormalities. (COR282). Mr. Moore received orders dated October 8, 2015, requiring him to report to the healthcare unit for x-rays at 7:00 a.m. on October 9, 2015. (COR214, 235). The x-rays ordered at the direction of the physician's assistant, which were conducted on October 9, 2015, did not reveal any change in Mr. Moore's condition. (COR280–281). Therefore, there is no indication of any worsening or decline in Mr. Moore's condition over the last 18 months which would necessitate any reconsideration of our medical evaluations and opinions related to his treatment. Based upon these prior studies alone and the information available to us now, I cannot identify any reason for any further imaging studies to be conducted now or in the past.

Mr. Moore's claim that he has been denied necessary medication for his medical condition is also inaccurate. Since November of 2014, the medical staff did attempt to manage Mr. Moore's complaints of pain with medication. (COR231–234). Mr. Moore's medical records show evidence

of the chronology of medication prescribed for him for his conditions.   For example, Mr. Moore received a 60-day prescription for the pain medication Ultram from Dr. Stone on June 2, 2015. (COR230).   During that same timeframe (i.e. June 2015), Mr. Moore received analgesic balm to assist and control his complaints of muscular pain. (COR229).   Mr. Moore also received a prescription for the steroid Prednisone on June 30, 2015. (COR228).   The Staton medical staff continued to renew all of Mr. Moore's medications on July 15, August 1 and August 8, 2015. (COR227).   During the course of the process of monitoring his medications, Mr. Moore received a prescription for the pain medication Mobic on July 20, 2015. (COR226).   When Mr. Moore received a renewed prescription for pain medication in August of 2015, at which time he was specifically instructed by the medical staff to begin tapering his reliance on the pain medication Tramadol, which is also known as Ultram. (COR225).   It is also worth noting that Mr. Moore missed a total of 33 doses of Tramadol during the period [of time] between March 26, 2015, and May 24, 2015.  Tramadol is an opioid pain medication used to treat moderate to severe pain and, unfortunately, it can be habit forming.  As such, we attempt to prescribe Tramadol/Ultram in shorter durations and prefer that patients do not rely upon these types of medications over a period of years, though reliance for a period of consecutive months is generally not problematic.

In Mr. Moore's case, several things are evident from a review of his medical records.  First, Mr. Moore is never satisfied with the level of pain medication prescribed for him, which does suggest some level of unnecessary dependence upon pain medication.   Secondly, the most efficient manner of treating Mr. Moore for his complaints of discomfort related to his osteoarthritis is not a continual reliance upon opioid pain medication.  In my opinion, some lesser form of pain medication should be more than adequate to control his complaints and Mr. Moore would likely derive a significant benefit from increasing his daily activity.   It is, however, important to note that there were occasions when Mr. Moore simply failed to appear to even receive his medications.  For example, during the period from November 1, 2014 through November 30, 2014, Mr. Moore never appeared on one occasion to receive his Mobic pain medication. (COR300).

There is no policy or procedure of any kind which would prevent me from providing any necessary medication to any patient within the custody of the Alabama Department of Corrections.  I never informed Mr. Moore that I was prevented from prescribing him any form of medication.  On the occasions that I evaluated Mr. Moore, I evaluated all of his symptoms as well as his medical history in considering the most appropriate course of treatment.  Unfortunately, Mr. Moore suffers from osteoarthritis which is a

degenerative condition for which there is minimal treatment. As multiple physicians have indicated to Mr. Moore, the best manner of treatment related to his condition involves increased physical activity, which will strengthen his overall musculoskeletal system and combat the degenerative effects of the osteoarthritis.

Contrary to Mr. Moore's allegations, the Staton medical staff has consistently addressed his living condition at this facility. For example, the Staton medical staff provided Mr. Moore with a cane on February 17, 2015, and he acknowledged his receipt of this cane in writing. (COR220). At this same time, Mr. Moore received a "profile" also known as a Special Needs Communication Form instructing the security staff to assign him to a bottom bunk and permitting him to skip any lines and proceed to the front of any lines within the facility such as the line at pill call or in the dining hall. (COR221, 240). These profiles have been in place as long as I have been the medical director at Staton and we have no intention of discontinuing these profiles at this time based upon Mr. Moore's condition. (COR215, 235)

If Mr. Moore feels unsafe, such is an issue related to security, as the Staton medical staff does not make housing or security decisions. There is no indication of Mr. Moore raising such complaints or concerns with the medical staff. The medical staff is however aware of a number of evaluations of Mr. Moore after various different altercations with other inmates. (COR269-270).

Based upon my review of Mr. Moore's circumstances, I am confident that he has received an appropriate level of treatment. Furthermore, I cannot see any reason to conclude that the course of treatment Mr. Moore received was inappropriate in any way or that the conduct of the our medical staff fell below the standard of care of that provided by other similarly situated medical professionals. Given this course of treatment, in my professional medical opinion, our medical staff acted appropriately in all respects. Again, based upon my review of Mr. Moore's medical records, I can state to a degree of medical certainty that the members of the medical staff at . . . Staton fully satisfied the standard of care owed by them within the State of Alabama.

With respect to Mr. Moore's continuing complaints related to his care, Mr. Moore is currently receiving excellent medical care. There is no evidence or objective data of any kind suggesting that Mr. Moore's condition changed, worsened or declined in any way as a result of the care he has received during his incarceration. I cannot identify any meaningful diagnostic benefit of an MRI at this point. Moreover, the x-ray results obtained have clearly identified the cause of Mr. Moore's current discomfort which is mild osteoarthritis, for which he is currently receiving

treatment consistent with the standard of care, *i.e.* a regimen of non-steroidal anti-inflammatory medications.  Any allegation by Mr. Moore that he currently does not have access to the medical services available to him at Staton is simply untrue.

42-2 at 2–9 (paragraph numbering omitted).

Dr. Karen Stone addresses the claims lodged against her as follows:

I have reviewed the affidavits of Drs. Hood and Herring, which does generally remind me of the limited number of occasions in 2015 when I examined him and afforded treatment to him. As stated by Drs. Hood and Herring, Mr. Moore has a long-standing diagnosis of osteoarthritis, which has been described in various imaging studies as "mild." I wholeheartedly concur with the manner in which the Staton medical staff has attempted to manage Mr. Moore's osteoarthritis in terms of their cautious use of narcotic and/or opioid pain medication with a determination to limit our patient's reliance upon these medications.  While these medications may provide short-term relief, they can ultimately lead to long-term harm, if they are not closely monitored in cases such as Mr. Moore.  Legions of studies have repeatedly shown the existing medical community that long-term dependence upon narcotic and opioid medications are commonly detrimental to patients such as Mr. Moore.  Unfortunately, this approach to the management of pain is often unpopular among patients.

As Dr. Herring points out, the numerous occasions when Mr. Moore missed the prescribed medications which were available to him at pill call demonstrate that such medications were not medically necessary and he could sustain himself without relying heavily upon these medications.

Despite Mr. Moore's dissatisfaction with the medical care provided to him, it is evident that he has received pain medication and routine evaluations. He is not a candidate for chronic care clinics since osteoarthritis is not a qualifying condition, nor has it ever constituted a qualifying condition for chronic care within the ADOC system.  Contrary to his allegations, I am not aware of any policy which ever impacted any of my treatment decisions pertaining to him.  I cannot identify a single policy adopted by ADOC or Corizon, which affected in any way the treatment decisions that I made for Mr. Moore.

Based upon the information I have reviewed, the members of the medical staff at . . . Staton fully satisfied the standard of care owed by them within the State of Alabama.  Moreover, it appears that the Staton medical staff continues to deliver appropriate and necessary care to Mr. Moore.  I am not aware of any evidence of any kind and have not received any

information that would even remotely suggest to me that Mr. Moore does not have access to a full scope of medical services at Staton which have addressed and continue to address his medical needs.

Doc. 42-3 at 2–3 (paragraph numbering omitted).

Additionally, Tammra Wood, a Licensed Practical Nurse, asserts that:

As an LPN, I am not authorized to diagnose medical conditions or prescribe medications during the course of any medical evaluations.  Any decisions related to the diagnoses of specific medical conditions and the treatment of those conditions are made exclusively by the clinicians at Staton. Furthermore, I cannot write any type of orders, such as "work stop" orders excusing inmates from work or prescriptions for medications.  Such matters are handled exclusively by the physicians and nurse practitioners at Staton.

I recall an inmate by the name of Thurmon E. Moore, II ("Mr. Moore"), who [at the time of this affidavit] is incarcerated at Staton.  In reviewing the portions of his medical records I received, I can identify a number of instances when I interacted with Mr. Moore or documented issues pertaining to Mr. Moore. (COR216, COR221, COR240, COR242, COR243, COR248, COR254, COR259, and COR265). These instances include the following: I documented his failure to appear for sick call evaluation on September 18, 2015. (COR216). I also signed a profile authorized by the nurse practitioner, which required Mr. Moore to be assigned to a bottom bunk, to utilize a cane and to skip any lines at pill call or the chow hall to avoid standing for an extended period of time. (COR221, 240).  At which time, Mr. Moore was given three (3) profiles. The profiles that Mr. Moore received included bottom bunk, front of the line and a cane profile. (COR221 and 240). I saw Mr. Moore on October 2, 2015, for an initial screening during sick call at which time we provided him with over-the-counter pain medication for his left elbow. (COR242–3). I took Mr. Moore's vital signs before his evaluation by the provider in February of 2015. (COR248). I also participated in the nursing sick call [process] during the August through October, 2015, timeframe. (COR254– 259).  At the conclusion of the September, 2015, nursing sick call, I referred Mr. Moore to the provider for further evaluation and provided him with over-the-counter pain medication and analgesic balm. (COR256). On two occasions in August and September of 2015, Mr. Moore simply refused to appear for sick call evaluation. (COR258-259).

Though I interacted with Mr. Moore on these few occasions, it is important to understand my role during these interactions. During the course of my limited interactions with him, I was not attempting to

diagnose his conditions, but my interactions were limited to nursing assessments only.  On some of those occasions, it did appear to me that he should be evaluated by a physician in light of a potential change in his overall condition, and, on other occasions, it appeared that he was voicing concerns related to issues for which he had previously been examined and for which he had received treatment.  I did not, however, ever make any treatment decisions pertaining to Mr. Moore, including decisions related to the necessity of imaging studies or prescription medications.  Those decisions are made solely by the providers at Staton.  My authority was primarily limited to the nursing assessments conducted.

More importantly, I did not deny Mr. Moore any necessary medical treatment.  To my knowledge, every complaint Mr. Moore submitted to the Staton medical staff resulted in some form of assessment by a member of the medical staff.  His medical records do show a number of evaluations and treatment plans enacted by the providers to attempt to address his osteoarthritis.  I did not ignore any of Mr. Moore's complaints.  I am not aware of any other member of the medical staff at Staton who allegedly ignored his complaints.  While it is evident that Mr. Moore is dissatisfied with the medical attention he has received, I cannot think of anything additional or different that I could have done in terms of addressing his complaints.

Doc. 42-7 at 1–3.

The medical records indicate that on June 26, 2014, a date outside the period of time addressed in this complaint, Defendant Burns, an LPN at Staton, addressed a sick call request filed by Moore on June 25, 2014 in which he sought renewal of his pain medications and a bottom bunk profile. Doc. 42-12 at 16–18.  Nurse Burns evaluated the plaintiff's condition, provided over-the-counter medication to him and requested a referral to the medial provider. Doc. 42-12 at 16.  As an LPN, Burns could not prescribe medication or issue the requested medical profile.   Finally, the remaining medical defendants filed affidavits detailing the limited scope of their interactions with Moore and

denying any deliberate indifference to his medical needs. Docs. 42-4, 42-5, 42-6, 42-8 & 42-9.

In addition to the foregoing statements, the Medication Administration Records contradict Moore's assertion that the defendants denied him medication for treatment of the pain associated with his osteoarthritis.  Specifically, these records, with respect to information relevant to the claims made the basis of the instant complaint, demonstrate that medical personnel routinely prescribed Moore medications in an effort to alleviate the pain associated with his arthritic condition.  From August of 2014 through November of 2015, Moore received prescriptions for an analgesic balm, Ultram, Mobic, Prednisone, and Tylenol. Doc. 42-14 at 18–32.  Moreover, it is undisputed that medical personnel issued profiles to Moore when they deemed his condition warranted this action. Doc. 42-14 at 7–8, 13–14, 16 & 18.

Under the circumstances of this case, the court concludes that the course of treatment undertaken by the medical staff at Staton did not violate Moore's constitutional rights.  In sum, there is no evidence upon which the court could conclude that any member of the medical staff who provided treatment to Moore acted in a manner that was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to the fundamental fairness." *Harris*, 941 F.2d at 1505.  Rather, the evidence before the court demonstrates that medical personnel, including the nursing staff and site physicians at Staton, examined Moore for his complaints of pain associated with osteoarthritis, prescribed medications to Moore in an effort to treat his pain, ordered x-

rays to aid in treating his condition, and issued special needs profiles when warranted. Whether medical personnel "should have [utilized] additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545 (internal citation omitted).  In addition, to the extent Moore complains that his physicians should have allowed continuous prescriptions for narcotic and opioid pain relievers or pursued a mode of treatment other than that prescribed, this allegation does not "rise beyond negligence to the level of [deliberate indifference]." *Howell v. Evans*, 922 F.2d 712, 721 (11th Cir. 1991); *Hamm*, 774 F.2d at 1505 (holding that inmate's desire for some other form of medical treatment does not constitute deliberate indifference violative of the Constitution); *Franklin*, 662 F.2d at 1344 (holding that simple divergence of opinions between medical personnel and inmate-patient do not violate the Eighth Amendment).

As a result, the court concludes that the alleged lack of medical treatment made the basis of the instant complaint did not constitute deliberate indifference.  Moore's self-serving statements of a lack of due care and deliberate indifference do not create a question of fact in the face of contradictory, contemporaneously created medical records. *Whitehead*, 403 F. App'x 401, 403 (11th Cir. 2010); *see also Scott*, 550 U.S. at 380 (2007) (holding that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary

judgment"); *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253–54 (11th Cir. 2013) (same).  In addition, Moore has failed to present any evidence showing that the manner in which the medical defendants addressed his condition created a substantial risk to his health that the attending health care personnel consciously disregarded.  The record is therefore devoid of evidence—significantly probative or otherwise—showing that any medical professional acted with deliberate indifference to a serious medical need experienced by Moore.  Consequently, summary judgment is due to be granted in favor of the medical defendants.

### 3.     *Correctional Defendants*

Defendants Forniss, Daniels, Thomas, and Crow aver that Moore has access to treatment from professional medical personnel while incarcerated in the state prison system. Doc. 42-10 at 2.  And it is clear from the medical records that the correctional defendants are not in any way involved in decisions regarding the medical treatment provided to Moore because these decisions were made solely by healthcare professionals employed by Corizon.

Moore has failed to establish deliberate indifference on the part of Defendants Forniss, Daniels, Thomas, and Crow.  Specifically, Moore has not demonstrated that these defendants were aware of facts establishing "an objectively serious medical need" or that these defendants disregarded any known serious risk to Moore's health resulting from his osteoarthritis. *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (holding that, for liability to attach, the official must know of and then disregard an excessive risk

of harm to the inmate); *Quinones*, 145 F.3d at 168 (holding that defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference); *Farmer*, 511 U.S. at 838 (holding that failure to alleviate significant risk that officer "should have perceived but did not" does not constitute deliberate indifference).   Consequently, summary judgment is due to be granted in favor of the correctional defendants on Moore's claim alleging deliberate indifference arising from the actions of medical personnel in treating his pain.

Insofar as Moore seeks to hold Defendants Forniss, Daniels, Thomas, and Crow liable for the treatment provided by medical professionals, he is likewise entitled to no relief as "[t]he law does not impose upon correctional officials a duty to directly supervise health care personnel, to set treatment policy for the medical staff or to intervene in treatment decisions where they have no actual knowledge that intervention is necessary to prevent a constitutional wrong." *Cameron v. Allen*, et al., 525 F. Supp. 2d 1302, 1307 (M.D. Ala. 2007) (citations omitted).

Even assuming *arguendo* that Defendants Forniss, Daniels, Thomas, and Crow exerted some control over the manner in which those persons responsible for the provision of medical treatment rendered such treatment, the law is well settled "that Government officials may not be held liable for the unconstitutional conduct of their subordinates [or co-workers] under the theory of *respondeat superior* [or vicarious liability]. . . . A public officer or agent is not responsible for the misfeasances or positive

wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed [alongside,] by or under him, in the discharge of his official duties. Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (internal quotation marks, citation, and parentheses omitted); *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (holding that "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability."); *Marsh v. Butler Cnty.*, 268 F.3d 1014, 1035 (11th Cir. 2001) (holding that a supervisory official "can have no respondeat superior liability for a section 1983 claim"); *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir.2003) (holding that concluding supervisory officials are not liable on the basis of respondeat superior or vicarious liability); *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999 (holding that 42 U.S.C. § 1983 does not allow a plaintiff to hold supervisory officials liable for the actions of their subordinates under either a theory of respondeat superior or vicarious liability). "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677. Thus, liability for actions of others could attach to the above-named defendants only if they "personally participate[d] in the alleged unconstitutional conduct or [if] there is a causal connection between [their] actions . . . and the alleged constitutional deprivation." *Cottone*, 326 F.3d at 1360.

The record establishes that Defendants Forniss, Daniels, Thomas, and Crow did not personally participate or have any involvement, direct or otherwise, in the medical treatment provided to Moore.   The evidentiary materials before the court further demonstrate that medical personnel made all decisions relative to the treatment provided to Moore and rendered treatment to him in accordance with their professional judgment upon assessment of his physical condition.

In light of the foregoing, Defendants Forniss, Daniels, Thomas, and Crow can be held liable for decisions of medical personnel only if they undertook actions which bear a causal relationship to the purported violation of Moore's constitutional rights.   To establish the requisite causal connection and therefore avoid entry of summary judgment in favor of the correctional defendants, Moore must present sufficient evidence which would be admissible at trial of either "a history of widespread abuse [that] put[] [the defendants] on notice of the need to correct the alleged deprivation, and [they] fail[ed] to do so" or a "custom or policy [that] result[ed] in deliberate indifference to [his medical needs], or . . . facts [that] support an inference that [the correctional defendants] directed the [facility's health care staff] to act unlawfully, or knew that [the staff] would act unlawfully and failed to stop them from doing so." *Cottone*, 326 F.3d at 1360 (internal punctuation and citations omitted).   After extensive review of the pleadings and evidentiary materials submitted in this case, the court concludes that Moore has failed to meet this burden.

The record contains no probative evidence to support an inference that Defendants Forniss, Daniels, Thomas, and Crow directed medical personnel to act unlawfully or knew that they would act unlawfully and failed to stop them.  In addition, Moore has presented no evidence of obvious, flagrant, or rampant abuse of continuing duration regarding his receipt of medical treatment in the face of which these defendants failed to take corrective action; instead, the undisputed medical records indicate that Moore had continuous access to medical personnel and received treatment for his pain.  The undisputed records also demonstrate that the challenged course of medical treatment did not occur pursuant to a policy enacted by the correctional defendants.  Thus, the requisite causal connection does not exist in this case and liability under the custom or policy standard is not justified. *Cf. Employment Div. v. Smith*, 494 U.S. 872, 877 (1990); *Turner v. Safely*, 482 U.S. 78 (1987).

For the foregoing reasons, summary judgment is likewise due to be granted in favor of defendants Forniss, Daniels, Thomas, and Crow with respect to liability based on the theory of respondeat superior.  Furthermore, as previously determined, even if Moore had presented a proper basis for the claims lodged against the correctional defendants, Staton healthcare personnel did not act with deliberate indifference to his medical needs.

## C.    Challenge to Conditions

Moore also complains that the prison system is overcrowded and that this overcrowding causes deficient healthcare services and safety issues.  He further alleges that prior to the issuance of his medical profiles he occasionally slept on the floor instead

of his assigned top bunk, had to cross various outside yards to reach the dining hall, and stood in line to eat.   Under the circumstances of this case, the court finds that the conditions about which Moore complains do not rise to the level of constitutional violations.

Although overcrowding and safety issues exist in the Alabama prison system, these facts, standing alone, are not dispositive of the issues before this court.   Only actions that deny inmates "the minimal civilized measure of life's necessities" are grave enough to establish constitutional violations. *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).   The Eighth Amendment proscribes those conditions of confinement which involve the wanton and unnecessary infliction of pain. *Id*. at 346.   Specifically, it is concerned with "deprivations of essential food, medical care, or sanitation" and "other conditions intolerable for prison confinement." *Id*. at 348 (citation omitted).   Prison conditions which may be "restrictive and even harsh, are part of the penalty that criminal offenders pay for their offenses against society" and, therefore, do not necessarily constitute cruel and unusual punishment within the meaning of the Eighth Amendment. *Id*.   Conditions, however, may not be "barbarous" nor may they contravene society's "evolving standards of decency." *Id*. at 345–46.   Although "[t]he Constitution 'does not mandate comfortable prisons' . . . neither does it permit inhumane ones[.]" *Farmer*, 511 U.S. at 832 (quoting *Rhodes*, 452 U.S. at 349).   Thus, a prisoner's conditions of confinement are subject to constitutional scrutiny. *Helling v. McKinney*, 509 U.S. 25 (1993).

A prison official has a duty under the Eight Amendment to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)); *Helling*, 509 U.S. at 31–32. For liability to attach, the challenged prison condition must be "extreme" and must pose "an unreasonable risk of serious damage to [the inmate's] future health." *Chandler v. Crosby*, 379 F.3d 1278, 1289–90 (11th Cir. 2004). As with deliberate indifference claims, to demonstrate an Eighth Amendment violation regarding conditions of confinement, a prisoner must satisfy both an objective and a subjective inquiry. *Farmer*, 511 U.S. at 834. The court described above the applicable standard for establishing the objective and subjective elements of an Eighth Amendment claim.

The living conditions within a correctional facility will constitute cruel and unusual punishment when the conditions involve or result in "wanton and unnecessary infliction of pain, [or] . . . [are] grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes,* 452 U.S. at 347. "Conditions . . . alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities. Such conditions could be cruel and unusual under the contemporary standard of decency. . . . But conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional." *Id*. at 347. In a case involving conditions of confinement generally or several different conditions, the court should consider whether

the claims together amount to conditions which fall below constitutional standards. *Hamm v. De Kalb County*, 774 F.2d 1567 (11th Cir. 1985); *see Chandler v. Baird*, 926 F.2d 1057 (11th Cir. 1991).

The court's consideration of whether the totality of a plaintiff's claims amount to conditions which fall below applicable constitutional standards is limited by the Supreme Court's admonishment that "*[s]ome* conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need. . . . To say that some prison conditions may interact in this fashion is a far cry from saying that all prison conditions are a seamless web for Eighth Amendment purposes.  Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Wilson v. Seiter,* 501 U.S. 294, 304–05 (1991).

As previously stated, a prison official may likewise be held liable under the Eighth Amendment for acting with deliberate indifference to an inmate's health or safety when the official knows that the inmate faces "a substantial risk of serious harm" and disregards that risk by failing to take reasonable measures to abate it. *Farmer*, 511 U.S. at 828.  "The known risk of injury must be a strong likelihood, rather than a mere possibility before [the responsible official's] failure to act can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (internal citations and quotation

marks omitted).   As a result, mere negligence "does not justify liability under section 1983[.]" *Id*.

Moore's general allegations regarding the conditions present at Staton do not establish that the challenged conditions denied him the minimal civilized measure of life's necessities or subjected him to a wanton and unnecessary infliction of pain. *Wilson*, 501 U.S. at 298–99; *Rhodes*, 452 U.S. at 347.   The conditions referenced by Moore, though uncomfortable, inconvenient, unpleasant, or objectionable, were not so extreme as to violate the Constitution. *See Baird*, 926 F.2d at 1289.   Moore does not allege, much less demonstrate, that he suffered the deprivation of a single individual human need. Moreover, Moore fails to demonstrate deliberate indifference or reckless disregard by the defendants with respect to the challenged conditions.   Specifically, he does not identify any particular condition of which the defendants were aware from which an inference could be drawn that a substantial risk of serious harm existed.   The record is also devoid of any evidence showing that the defendants drew the requisite inference.   Consequently, summary judgment is due to be granted in favor of the defendants on the plaintiff's claims attacking the conditions of confinement at Staton. *See McElligott*, 182 F.3d at 1255; *Carter*, 352 F.3d at 1349–50.

**D.     Medical Co-Payments**

In the complaint, Moore makes a number of references to co-payments charged for treatment provided by medical personnel other than physicians.   To the extent Moore challenges the constitutionality of these co-payments, he is entitled to no relief.

The charging of a co-payment for medical treatment provided to an inmate, standing alone, does not violate the Constitution.  The simple fact that Moore is charged a nominal fee or co-payment for medical treatment does not in any way deprive him of a protected right, privilege or immunity. *Shapley v. Nev. Bd. of St. Prison Comm.*, 766 F.2d 404, 408 (9th Cir. 1985) (holding that imposition of fee for medical treatment provided to an inmate does not amount to a constitutional violation); *Jones v. Corizon*, 2015 WL 5013954 at *17 (M.D. Ala. 2015) (finding that charging of a co-payment for treatment provided each time inmate seeks treatment through the sick call process is not violative of the Constitution); *Bester v. Wilson*, 2000 WL 1367984 at *8 (S.D. Ala. August 18, 2000); (finding that "the charging of a fee to prisoners for medical treatment from their [available] funds has been held to be constitutional when challenged on several due process and Eighth Amendment grounds").  There is no evidence before the court that Moore was denied medical treatment due to his inability to pay the applicable fee; instead, the evidentiary materials establish that Moore received medical treatment regardless of whether he possessed the ability to make a co-payment.  Since Moore has failed to allege a violation of his constitutional rights with respect to the assessment and collection of fees associated with medical treatment, the defendants are entitled to summary judgment on this claim.

## IV.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.     The defendants' motion for summary judgment be GRANTED.

2.      Judgment be GRANTED in favor of the defendants.

3.      This case be DISMISSED with prejudice.

4.      Costs be taxed against the plaintiff.

On or before **May 9, 2018** the parties may file objections to this Recommendation. A party must specifically identify the factual findings and legal conclusions in the Recommendation to which the objection is made; frivolous, conclusive, or general objections will not be considered.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's Recommendation shall bar a party from a *de novo* determination by the District Court of factual findings and legal issues covered in the report and shall "waive the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice. 11th Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE this 25th day of April, 2018.

GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE